## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

YUSEF BROWN-AUSTIN,

    Plaintiff,

    v.

ANNETTE CHAMBERS-SMITH, et al.,

    Defendants.

Case No. 1:24-cv-397

McFarland, J.
Bowman, M.J.

### REPORT AND RECOMMENDATION

Plaintiff Yusef Brown-Austin, through counsel, filed this prisoner civil rights case against eleven defendants on July 29, 2024. For the convenience of the Court, the ten individuals and entity named as defendants are divided into two groups: the "CoreCivic Defendants" and the "State Defendants."[1] Both groups have moved to dismiss the operative Second Amended Complaint.

Plaintiff's counsel withdrew from representation on February 7, 2025. After he withdrew, Plaintiff filed pro se responses to Defendants' motions to dismiss as well as a motion seeking leave to file a Third Amended Complaint. In addition, Plaintiff has moved for a declaratory judgment. A motion for spoliation sanctions, previously filed by counsel at Plaintiff's request, is also pending.

---

[1] Where counsel has identified minor misspellings in Defendants' names (i.e., "Douglas" instead of "Douglass," the corrected spellings are used. The State Defendants consist of Defendants Annette Chambers-Smith (Director of the Ohio Department of Rehabilitation and Correction), Chief Inspector Christopher Lambert, SOCF Warden Cynthia Davis, SOCF Unit Management Chief Jeremy Oppy, and the Unknown Block Officer. The latter has never been identified or served, and the time for doing so has long expired. The CoreCivic Defendants consist of CoreCivic, Inc. and individual Defendants who worked at the Northeastern Ohio Correctional Complex ("NEOCC"), including Douglas Fender (Warden), Deputy Warden Richard Phiffer, David Bobby (former Warden), Unit Manager Douglas and (former) Assistant Investigator Wyman.

On March 25, 2025, U.S. District Judge Matthew W. McFarland referred this case to the undersigned magistrate judge to rule on all pending pretrial matters, and to issue a Report and Recommendation ("R&R") on any matters classified as dispositive. (Doc. 40.) For the reasons that follow, this R&R recommends that the CoreCivic Defendants' motion to dismiss be GRANTED, that the State Defendants' motion to dismiss be GRANTED in part and DENIED in part, and that Plaintiff's motion to further amend his complaint be DENIED. Last, the R&R recommends that Plaintiff's motion for declaratory judgment and for spoliation sanctions be DENIED.[2]

## I.      Standard of Review

Whether evaluating the Defendants' pending motions to dismiss under Rule 12(b)(6), or Defendants' opposition to Plaintiff's motion to amend, the standard of review is the same. Under Rule 12(b)(6), this Court must "construe the complaint in the light most favorable to the nonmoving party, accept the well-pled factual allegations as true, and determine whether the moving party is entitled to judgment as a matter of law." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007). At the same time, this Court

> need not accept the plaintiff's legal conclusions or unwarranted factual inferences as true. *Gregory v. Shelby County,* 220 F.3d 433, 446 (6th Cir. 2000). To state a valid claim, a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory. *Mezibov v. Allen,* 411 F.3d 712, 716 (6th Cir. 2005), *cert. denied*, 547 U.S. 1111, 126 S. Ct. 1911, 164 L.Ed.2d 663 (2006).

*Id.*, 508 F.3d at 336-37. The determination of whether Plaintiff's allegations state a claim primarily rest upon the allegations included in his complaint. But "matters of public record,

---

[2]A motion for spoliation sanctions may or may not be dispositive, depending on whether the relief sought is "dispositive." Because Plaintiff may be seeking some form of dispositive evidentiary relief, the undersigned has recommended a ruling in this R&R rather than disposing of the motion by order.

orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin Coll.,* 259 F.3d 493, 502 (6th Cir. 2001) (internal quotation and citation omitted). Here, the relevant public records include Plaintiff's prior federal cases.

## II.    Related Case Procedural History and Relevant Allegations

Defendants' pending motions to dismiss and Plaintiff's motion to amend both rely in part on the doctrine of res judicata. The above-captioned case was filed one year after two related cases. To provide the necessary context, the undersigned begins by taking judicial notice of those cases before turning to the case at hand.

### Plaintiff's First Case: No. 475

Through the same counsel, Plaintiff filed his first case on July 27, 2023 against ten of the eleven defendants named in the above-captioned case.[3] *See Brown-Austin v. Chambers-Smith, et al.*, No. 1:23-cv-475-MRB. (hereafter "No. 475"). A civil cover sheet accompanying the complaint designates that case as one filed pursuant to the civil rights statute, 42 U.S.C. § 1983. (*See* Doc. 2). But the original pleading contains only a cursory reference to that statute in a single heading. (*See* Doc. 4, PageID 21). In contrast to the heading, the body of the original complaint sets out a single claim under an entirely different statute, civil RICO, alleging predicate violations and that Defendants "engaged in a pattern of corrupt activity which caused injury to the Plaintiff." (*See* Doc. 4, ¶¶ 37-50, citing 18 U.S.C. §§ 1961(1), 1962(c) and 1964(c)).

After initiating suit with a RICO claim, Plaintiff filed an amended complaint in October 2023 in No. 475 that entirely deleted his RICO claim in favor of pleading two new

---

[3]The eleventh defendant differs. In No. 478, Plaintiff named Hearing Officer Ryan Rush. In the above-captioned case, Plaintiff omits Rush and instead identifies the Unknown Block Officer at SOCF.

causes of action under 42 U.S.C. §§ 1983 and 1981. (*See* Doc. 7, PageID 41). The omission of the RICO claim in the amended complaint amounted to a voluntary dismissal of that claim. In place of RICO, the amended complaint asserts that Defendants violated Plaintiff's rights under the First and Fourteenth Amendments: (1) "Defendants engaged in a pattern of retaliation against the Plaintiff's first amendment rights to employ the grievance process," (Doc. 7, PageID 51-52), and (2) "Defendants violated Plaintiff's right to procedural due process by failing to give him written notice and a hearing prior to his being transferred to the Ohio State Penitentiary." (*Id.*, PageID 55). Plaintiff filed a second amended complaint on January 15, 2024 that pleads the same retaliation and procedural due process claims. (*See* Second Amended Complaint, Doc. 17).

The underlying factual allegations in Plaintiff's first case mirror the allegations presented in Plaintiff's two later-filed cases. In all three cases, he alleges that he was first incarcerated at the Northeastern Ohio Correctional Center ("NEOCC") in 2017. NEOCC was run by Defendant CoreCivic, a Tennessee corporation "that runs private prisons throughout North America," including NEOCC under contract with the State of Ohio. (Doc. 17, ¶ 20). Plaintiff is a member of the Crips gang. At NEOCC, he alleges that he and other gang members were tasked by authorities to provide security at the prison to "keep the peace." (Doc. 17, ¶ 22; *see also id.*, ¶¶ 21-32).

Plaintiff alleges that Defendants transferred him from NEOCC to OSP on July 29, 2022 after he refused to retrieve a contraband handgun and "filed a direct grievance to the ODRC Chief Inspector about the events at NEOCC and the ICR he filed," and after his brother contacted the Ohio State Highway Patrol. (*Id.*, ¶¶ 36, 58-59, 62.) Plaintiff alleges that in addition to the involvement of the NEOCC Defendants in his transfer from

NEOCC to OSP, other Defendants including the ODCR Director "would have to sign off." (*Id.*, ¶ 61, 75). Plaintiff's retaliation claim alleges that his transfer from NEOCC "was obviously motivated by his threatening to expose how NEOCC was run. (*Id.*, ¶ 59.)

Upon arriving at OSP, Plaintiff alleges that he submitted additional informal "kites" and was quickly transferred again from OSP to the Southern Ohio Correctional Facility ("SOCF"). (*Id.*, ¶¶ 39-41). In addition to being transferred to OSP and then to SOCF, Plaintiff was falsely charged and found guilty at an RIB hearing on August 1, 2022 regarding his prior involvement in an inmate assault at NEOCC.[4] Plaintiff alleges that he was told that the finding of guilt and subsequent adverse impact on his security level on August 11, 2022 was "in retaliation for his filing a lawsuit against ODRC and CORECIVIC."[5] (*Id.*, ¶¶44, *see also, generally,* ¶¶42-45, 63-64). He alleges other unknown inmates and guards at SOCF committed other acts of retaliation. (*Id.*, ¶¶ 47-50).

In his second claim in No. 475, Plaintiff alleges that all Defendants violated his Fourteenth Amendment right to procedural due process when he was transferred to OSP without notice and a hearing. (*Id.*, ¶¶ 74-75).

State Defendants Chambers-Smith and Lambert[6] moved to dismiss both civil rights claims in No. 475, as did CoreCivic Defendants Fender and Wyman in a separate motion.[7]

---

[4]Based on context, the undersigned infers that the RIB hearing was held at SOCF.

[5]Plaintiff did not file his first lawsuit against ODRC and CoreCivic in this Court until July 27, 2023. Thus, the allegation that Defendants informed Plaintiff in August **2022** that his security level was being adjusted "in retaliation for …filing a lawsuit" in July **2023** is not plausible.

[6]The State of Ohio joined the motion as an interested party on behalf of three unserved State Defendants: Davis, Oppy, and Hearing Officer Ryan Rush,

[7]The record reflects that Plaintiff initially failed to timely serve seven Defendants. The State of Ohio appeared as an "interested party" on behalf of three unserved Defendants (Davis, Rush, and Oppy) but the remaining unserved CoreCivic Defendants did not appear. Plaintiff moved to enlarge the time permitted for service, but the Court denied his motion based on counsel's failure to show "good cause," and lack of diligence. (Doc. 42.)

On August 8, 2024, Plaintiff voluntarily dismissed No. 475 without prejudice before the Court could rule on Defendants' pending motions to dismiss.

**Plaintiff's Second Case: No. 478**

On July 28, 2023, one day after filing No. 475, Plaintiff's counsel filed No. 1:23-cv-478-MWM-SKB ("No. 478"). Plaintiff's second case named seven of the eleven defendants from No. 475.[8] The civil cover sheet attached to No. 478 identifies the action as a "[p]rivate action related to RICO." (Doc. 1-1). But as in No. 475, the body of Plaintiff's complaint does not match the cover sheet. Rather than a RICO claim, the complaint contains two civil rights claims that mirror the claims presented in No. 475: (1) that "Defendants engaged in a pattern of retaliation against Plaintiff's First Amendment rights to employ the grievance process" and (2) that "Defendants violated Plaintiff's right to procedural due process by failing to give him written notice and a hearing" before transferring him to the Ohio State Penitentiary. (Doc. 1, PageID 11-12, 15).

In another parallel, two CoreCivic Defendants (Fender and Wyman) and two State Defendants (Chambers-Smith and Lambert) moved to dismiss for failure to state a claim. After several extensions of time, Plaintiff responded to both motions.

Because Plaintiff's counsel had failed to serve some defendants in No. 478, the Court issued a "Show Cause" Order warning Plaintiff that Deputy Warden, Unit Manager Douglas, and CoreCivic Corporation would be dismissed for failure of service. But Plaintiff successfully moved to extend time to perfect service and belatedly obtained service on

---

[8]The seven Defendants named in both No. 475 and No. 478 include: Annette Chambers-Smith, Doug Fender, [unnamed] Deputy Warden, Unit Manager Douglas, Assistant Investigator Wyman, CoreCivic Corporation, and Chief Inspector Chris Lambert. The four defendants who appear in No. 475 but not in No. 478 are former NEOCC Warden David Bobby, SOCF Warden Cynthia Davis, SOCF Hearing Officer Ryan Rush, and SOCF Unit Management Chief/Deputy Warden J. Oppy.

CoreCivic Corporation, which promptly moved to dismiss. Because Plaintiff did not obtain service on the Deputy Warden or Unit Manager Douglas, the Court dismissed them without prejudice based on a failure of service.

On August 22, 2024, the Court granted all remaining Defendants' motions, dismissing all claims on the merits. Plaintiff did not appeal. Five months later on January 28, 2025, Plaintiff filed a pro se motion to vacate the Court's judgment in No. 478 under Rule 60(b), Fed. R. Civ. P., and to consolidate that case with the above-captioned case. By separate R&R filed this day in No. 478, undersigned recommends denial of Plaintiff's Rule 60(b) motion.

**Plaintiff's Third Case: No. 397**

On July 29, 2024, a year after filing his first two cases and weeks before he voluntarily dismissed No. 475 and receiving an adverse judgment in No. 478, Plaintiff filed the above-captioned third civil rights case ("No. 397"). In addition to the new complaint, Plaintiff moved for preliminary injunctive relief. (Docs. 1, 3.) Within a few weeks, Plaintiff twice amended his original complaint. (Docs. 5, 8.)

In an order denying preliminary injunctive relief, Judge McFarland closely reviewed the allegations and claims presented in Plaintiff's Second Amended Complaint. In the interest of judicial economy, the undersigned adopts most of Judge McFarland's summary.[9]

> Plaintiff was initially incarcerated at the Northeastern Ohio Correctional Center ("NEOCC"). (Second Am. Compl., Doc. 8, ¶¶ 1, 2.) Defendant Core Civic Inc. operates the NEOCC pursuant to a contract with the State of Ohio. (*Id.* at ¶ 2.) During Plaintiff's incarceration, Core Civic failed to sufficiently staff the NEOCC. (*Id.* at ¶ 4.) To remedy this, the staff negotiated with the prison's gang leaders, agreeing that if the gangs reduced prison violence,

---

[9]Below, the undersigned separately addresses allegations in the above-captioned complaint that pertain to events after July 28, 2023.

the NEOCC would allow the gang leaders to "control the prison." (*Id.* at ¶ 20.)

At first, Plaintiff willingly participated in this agreement. (Second Am. Compl., Doc. 8, ¶¶ 24-29.) In June 2022, however, a guard brought a loaded firearm into the NEOCC, which an inmate retrieved. (*Id.* at ¶ 30.) The NEOCC administration ordered Plaintiff to take the firearm from the inmate, but Plaintiff refused. (*Id*.) Later, Plaintiff's brother alerted the Ohio State Highway Patrol that the NEOCC ordered Plaintiff to seize a firearm from inside the prison. (*Id.* at ¶ 33.) This angered Defendants, who began to question whether they could trust Plaintiff. (*Id*. at ¶ 34.) Around the same time, Plaintiff was placed under heightened security after another inmate was attacked. (*Id.* at ¶ 31.)

On July 29, 2022, Plaintiff was transferred to the Ohio State Penitentiary. (Second Am. Compl., Doc. 8, ¶ 36.) On August 1, 2022, Plaintiff attended a hearing concerning the attack at the NEOCC. (*Id.* at ¶ 38.) At the hearing, Plaintiff was "found guilty," despite "the officer say[ing] they had no evidence from the case." (*Id*.) Later that month, a security review was held, and Plaintiff was again placed under heightened security. (*Id.* at ¶ 39.) Plaintiff, however, was not present at the security review. (*Id*.) Plaintiff was then transferred to the Southern Ohio Correctional Facility ("SOCF"). (*Id.* at ¶ 44.) Since his transfer, Plaintiff has experienced threats and mistreatment from corrections officers. (*Id*. at ¶¶ 46-49.)

(Doc. 37, Order and Opinion pp. 1-2, PageID 466-467). As noted, the same allegations appear in Plaintiff's pleadings in No. 475 and No. 478.

Plaintiff's first and second claims in No. 397 are the same as previously asserted in Nos. 475 and 478, except that in No. 397, he also bases his retaliation claim on his "lawsuit." The instant case includes a third claim that alleges additional retaliation in the form of a due process violation relating to a security hearing, and "cruel and unusual punishment" in violation of the Eighth Amendment based on events at SOCF. Plaintiff's third claim alleges that Defendants retaliated against him specifically for his lawsuit(s). For all three claims, Plaintiff alleges jurisdiction under 42 U.S.C. §§1981 and 1983.

Ten defendants have moved to dismiss all claims asserted. (*See* Doc. 20, motion by CoreCivic Defendants (Wyman, Phiffer, Fender, Bobby, Douglas and CoreCivic) and

Doc. 25, motion by State Defendants (Chambers-Smith, Lambert, Davis and Oppy)). The eleventh defendant in No. 397 has never been identified other than as the "Unknown Block Officer," has never been served, and has not appeared.

After Defendants moved to dismiss, Plaintiff moved for leave to file a Third Amended Complaint in order to add a fourth claim for civil RICO, as well as to "correct" and/or add factual allegations to support his first three claims. (Doc. 33.) Defendants oppose further amendment. Defendants primarily argue that amendment is futile, because none of Plaintiff's claims can withstand a motion to dismiss. *Doe v. Michigan St. Univ.*, 989 F.3d 418, 427 (6th Cir. 2021); *Hoover v. Langston Equip. Assocs.*, 958 F.2d 742, 745 (6th Cir. 1992). The undersigned agrees.

### III. Plaintiff's Motion to Amend to Add a Civil RICO Claim

Plaintiff seeks to add a new claim to allege that Defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § § 1962 *et seq*. But Defendants persuasively argue that the proposed RICO claim would not survive a challenge to Plaintiff's statutory standing. The civil RICO statute provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 ...." 18 U.S.C. § 1964(c). Under the statute, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). An injury to the plaintiff's "business or property" ordinarily excludes his personal injuries. *See Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 564-65 (6th Cir. 2013), overruled on other grounds in *Medical Marijuana, Inc. v. Horn*, 145 S.Ct. 931 (2025). "Recovery for physical injury or mental suffering is not allowed

9

under civil RICO because it is not an injury to business or property." *Fleischhauer v. Feltner*, 879 F.2d 1290, 1300 (6th Cir. 1989). In other words, RICO "[p]laintiffs need to show they suffered a commercial injury." *Compound Prop. Mgmt. LLC v. Build Realty, Inc.*, 343 F.R.D. 378, 406 (S.D. Ohio 2023).

In his tendered Third Amended Complaint, Plaintiff alleges that Defendants violated RICO by engaging in an enterprise "to maximize profits" at NEOCC by "chronically understaffing NEOCC and by using slaves" (i.e., Plaintiff and other gang leaders) to provide security and keep violence at NEOCC at a low enough level that CoreCivic would not lose its contract with ODRC. (Doc. 33-1, ¶¶ 59-69). Plaintiff further alleges that at NEOCC "[c]hronic understaffing and corruption have led to contraband smuggling, medical neglect, physical and sexual violence, and murder." (*Id.*, ¶ 64). Although Plaintiff alleges various "predicate violations," (*id.* ¶¶ 65-69), he fails to allege that he has suffered any type of commercial injury to his business or property. Instead, Plaintiff alleges that the RICO violations caused him to lose a scholarship which will impact Plaintiff's future earnings, and indirectly resulted in a conduct report that will negatively impact his parole hearing. (*Id.*, ¶ 69). He also claims he was damaged by being moved to a prison "far away from Stark County and his family." (*Id.*).

Personal injuries alleged by a prisoner are insufficient as a matter of law to satisfy the statutory prerequisite for standing under civil RICO. *See Lee v. Michigan Parole Bd.*, 104 Fed. Appx. 490, 493, 2004 WL 1532563, at *2 (6th Cir. 2004); *Looper v. Gibson,* 63 Fed. Appx. 877, 878 (6th Cir.2003); *Sharp v. Ingham County*, 23 Fed. Appx. 496, 499 (6th Cir. 2001). In fact, courts routinely dismiss claims by inmates for lack of standing under civil RICO. *See*, *e.g.*, *Crosky v. Ohio Dep't of Rehab. & Corr.*, No. 2:09-CV-400, 2012 WL

10

748408, at *13 (S.D. Ohio Mar. 8, 2012); *Jacobs v. Ohio Dept. of Rehabilitation and Correction*, No. 2:08-cv-713-TPK  2009 WL 1911786, at *5 (S.D. Ohio June 30, 2009) (personal injuries including emotional distress, oppression, duress and intimidation "are precisely the sort of damages that are not recoverable under civil RICO because they do not involve [the prisoner's] business or property."); *Annabel v. Michigan Dept. of Corrections*, No. 1:14–cv–756, 2014 WL 4187675, at *21 (W.D. Mich. Aug. 21, 2014). Plaintiff's proposed RICO claim thus fails for lack of standing.

In his reply memorandum, Plaintiff argues that the Supreme Court's recent decision in *Medical Marijuana, Inc. v. Horn* overrules the statutory limitation of recovery for injury to "business or property." Plaintiff is mistaken. In *Medical Marijuana*, the Court merely resolved a circuit split concerning "whether civil RICO bars recovery for all business or property harms that *derive from* a personal injury." *Id.*, 145 S. Ct. at 938 (emphasis added). The Court expressly rejected an interpretation that civil RICO "preclude[s] relief for any economic loss (including loss to business or property) that *results from* a personal injury." *Id.*, 145 S.Ct. at 938 (emphasis added). At the same time, the Court reaffirmed that §1964(c) only permits recovery for injury to business or property.

> [B]y explicitly permitting recovery for harms to business and property, it implicitly excludes recovery for harm to one's person. See *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 350, 136 S.Ct. 2090, 195 L.Ed.2d 476 (2016); see also A. Scalia & B. Garner, Reading Law § 10, p. 107 (2012) ("[S]pecification of the one implies exclusion of the other"). But the "business or property" requirement operates with respect to the *kinds* of harm for which the plaintiff can recover, not the *cause* of the harm for which he seeks relief. For example, if the owner of a gas station is beaten in a robbery, he cannot recover for his pain and suffering. But if his injuries force him to shut his doors, he can recover for the loss of his business. In short, a plaintiff can seek damages for business or property loss regardless of whether the loss resulted from a personal injury.

*Id.*, 145 S.Ct. at 939) (emphasis in original).  In the case presented here, Plaintiff identifies only personal injuries and does not identify any type of commercial injury to his "business" or "property" caused by the alleged RICO violation.[10]

### IV.    Additional Proposed Amendments and Motions to Dismiss

In his response  to Defendants' motions to dismiss, Plaintiff does not object to the dismissal of State Defendant Lambert and CoreCivic Defendant Fender (at times misspelled as "Bender").[11] (Doc. 32, PageID 300.) But apart from that agreement, Plaintiff insists that he should be permitted to amend to correct "errors" made by his former counsel. Defendants disagree, arguing that any further amendment is futile. Defendants' argument is well-taken.

The undersigned concludes that Plaintiff's First Amendment retaliation claim and Fourteenth Amendment due process claims are almost completely barred by res judicata or claim preclusion.[12] Plaintiff's third claim, alleging  further retaliation at SOCF, is procedurally barred only in part. In addition to claim preclusion, most of Plaintiff's allegations substantively fail to state any claim against the identified Defendants. Still, out of an abundance caution at this preliminary stage of proceedings, Plaintiff's claim of further retaliation at SOCF by Defendants Davis and Oppy should be permitted to proceed.

---

[10]The undersigned finds no need to reach Defendants' arguments that the civil RICO claim fails for other reasons. (*See* Doc. 41, PageID 493-505.)

[11]Plaintiff's Second Amended Complaint spells the Defendant's surname variously as both Fender and Bender. (*See* Doc. 8, ¶¶ 11, 13, 90.)

[12]In *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984), the United States Supreme Court expressed its preference for usage of the terms "issue preclusion" and "claim preclusion" to refer to the preclusive effect of a prior judgment, rather than the more common terms of "collateral estoppel" and "res judicata." Although the Sixth Circuit long ago agreed, *see Heyliger v. State University and Community College Sys. of Tenn.*, 126 F.3d 849, 852 (6th Cir. 1997), the Latin phrases remain widely used.

### A.  The Claim Preclusive Effect of No. 478[13]

"Res judicata encompasses both issue preclusion, which precludes relitigation of issues that were raised and resolved in a prior action, and claim preclusion, which precludes litigation of issues that should have been raised in a prior action, but were not." *Annabel v. Michigan Dept. of Corrections*, No. 16-2532, 2017 WL 11639427, at *2 (6th Cir. Oct. 2, 2017) (quoting *Migra*, 465 U.S. at 77 n.1); *see also Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir. 1995).[14] Claim preclusion has four elements:

1. A final decision on the merits in the first action by a court of competent jurisdiction;

2. The second action involves the same parties, or their privies, as the first;

3. The second action raises an issue actually litigated or which should have been litigated in the first action;

4. An identity of the causes of action.

*Sanders Confectionery Products, Inc. v. Heller Financial, Inc.*, 973 F.2d 474, 480 (6th Cir. 1992) (citations omitted). Here, Plaintiff's claims are subject to dismissal based on the preclusive effect of the complaint he filed in No. 478 on July 28, 2023.

In opposition to the procedural bar, Plaintiff first argues that under state law, this Court should not consider the defense of res judicata in the context of a motion to dismiss.

---

[13]Plaintiff briefly argues that res judicata cannot be based on his voluntary dismissal of No. 475 *without prejudice*. Defendants do not dispute that contention. Although they cite to No. 475 for other reasons, they rely solely on No. 478 for the application of res judicata. (*See* Doc. 36, PageID 462.) But the CoreCivic Defendants do include an argument urging dismissal based on Plaintiff's use of the disfavored practice of "claim splitting." That theory would permit this Court to consider No. 475 despite the lack of final judgment. *See Wilkins v. Jakeway*, 183 F.3d 528,535 (6th Cir. 1999). The undersigned finds no need to reach this additional argument.

[14]In *Annabel*, the Sixth Circuit upheld the dismissal of a prisoner suit as "frivolous" under the Prison Litigation Reform Act ("PLRA") based on claim preclusion. Case law that supports dismissal under 28 U.S.C. § 1915A also supports granting Defendants' motions to dismiss. *See generally, In re Prison Litigation Reform Act*, 105 F.3d 1131, 1134 (6th Cir. 1997) (holding that the PLRA requires screening of "all civil cases brought by prisoners, regardless of whether the inmate paid the full filing fee, is a pauper, is pro se, or is represented by counsel."

But "[f]ederal *res judicata* applies here because Plaintiff's earlier suit involved a federal claim that resulted in a federal judgment." *Coleman v. Martin*, 363 F.Supp.2d 894, 901 (E.D. Mich. 2005) (additional citations omitted). Consistent with *Annabel* where the Sixth Circuit approved of sua sponte consideration of res judicata, federal courts have widely held that res judicata may be raised in a motion to dismiss. *See id.*, 363 F.Supp.2d at 903 (collecting cases).

In this very case, Judge McFarland previously reasoned that at least some of Plaintiff's current claims are barred by the doctrine. In his Order and Opinion denying Plaintiff's motion for a preliminary injunction, Judge McFarland wrote:

> Plaintiff brings claims for Retaliation, Procedural Due Process, and Cruel and Unusual Punishment against every Defendant. (Second Am. Compl., Doc. 8.) The State Defendants argue that Plaintiff cannot show a likelihood of success because his claims against Defendants Chambers-Smith and Lambert are barred by res judicata. (State Defendants' Response, Doc. 26, Pg. ID 240-41; State Defendants' Motion to Dismiss, Doc. 25, Pg. ID 222.) … For a claim to be barred, the following elements must be present:
>
> > (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their "privies"; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.
>
> *Bittinger v. Tecumseh Products Co.*, 123 F.3d 877,880 (6th Cir. 1997).
>
> Plaintiff filed an earlier complaint before this Court in… No. I:23-CV-478 ("the Prior Action"). There, Plaintiff alleged Retaliation and Procedural Due Process violations by Defendants Chambers-Smith and Lambert. Brown-*Austin v. Chambers-Smith*, No: I:23-CV-478, 2024 U.S. Dist. LEXIS 151849, at *5-6 (S.D. Ohio Aug. 22, 2024). This Court summarily dismissed all of Plaintiff's claims. *Id.* at *20. Although the order did not plainly state whether the dismissal was with prejudice, Federal Rule of Civil Procedure 41(b) dictates that "unless a dismissal states otherwise, a dismissal ... operates as an adjudication on the merits." Since this Court's Order did not state otherwise, the Prior Action was a final decision adjudicated on the merits. Turning to the remaining res judicata elements, the Prior Action included Defendants Chambers-Smith and Lambert. *Id.* at *4. Next, any

14

claim Plaintiff now brings was or could have been litigated in the Prior Action. Finally, the Prior Action involved the same series of events for which Plaintiff brings his current claims. *See id.* at *2-6. Thus, Plaintiff's claims against Defendants Chambers-Smith and Lambert are precluded and cannot succeed on the merits.

(Doc. 37 at pp. 7-8, PageID 472-473). In short, this Court's dismissal of Plaintiff's prior claims against State Defendants Chambers-Smith and Lambert in No. 478 bars relitigation of the same claims against those Defendants in No. 397.

In his denial of preliminary injunctive relief, Judge McFarland also considered the claims against other Defendants - Davis and Oppy – who were not named in No. 478. Res judicata still would apply as long as Davis and Oppy stand "in privity" with the previously dismissed State Defendants in No. 478. But instead of addressing that unbriefed issue, the Court denied preliminary injunctive relief on grounds that Plaintiff failed to cite to any evidence to support preliminary injunctive relief against Davis and Oppy. (Doc. 37 at 8, PageID 473). Similarly, Judge McFarland's Order did not address the potential application of res judicata against the CoreCivic Defendants. Instead, the Court denied relief against those Defendants because any injunctive relief against them had become moot due to Plaintiff's transfer from NEOCC. (Doc. 37, at 6, PageID 471).

The CoreCivic Defendants now argue that the doctrine of res judicata bars all claims against them because they stood in privity with three CoreCivic Defendants in No. 478 whose motions to dismiss were granted. Likewise, the State Defendants maintain that res judicata bars the instant claims against them based on their privity with State Defendants Chambers-Smith and Lambert in No. 478.

In response, Plaintiff argues that if even res judicata were to bar his claims against the five Defendants who won dismissal in No. 478,[15] the doctrine should not apply to all Defendants. Noting that NEOCC Deputy Warden Phiffer[16] and Unit Manager Douglas were dismissed in No. 478 "without prejudice" due to Plaintiff's failure to serve them, Plaintiff seeks to avoid the procedural bar for his claims against those Defendants.[17]

The procedural bar applies for all Defendants named in this case, regardless of whether they were previously named or served in No. 478. Plaintiff's claims against CoreCivic Defendants Bobby, Phiffer, and Douglas are barred because they were in privity with CoreCivic Defendants Warden Fender and Assistant Investigator Wyman, who were dismissed with prejudice in No. 478. The factual basis for the claims against all CoreCivic Defendants is identical,[18] and all other elements of res judicata apply. *See Jackson v. Pline*, No. 92-1172, 1992 WL 203760, at *1 (6th Cir. Aug. 20, 1992) ("Although Jackson named different state employees in the second case, he is barred from raising the same claim against them as they are in privity with the previous defendants."); *see also, Randles v. Gregart*, 965 F.2d 90, 93 (6th Cir. 1992) (non-mutual claim preclusion appropriate when pro se litigant brings repeated actions upon same operative facts with slight change in legal theories); *Theriot v. Woods*, No. 2:18-cv-92, 2019 WL 409507, at

---

[15]*See* No. 478, (Doc. 31), granting motions of the CoreCivic entity, CoreCivic Defendants Fender and Wyman, State Defendants Chambers-Smith and Lambert.

[16]Other than the addition of his surname in No. 397, Deputy Warden Phiffer appears to be the same individual previously identified as "Deputy Warden" in both Nos. 475 and No. 478.

[17]Plaintiff incorrectly states that CoreCivic (former) Warden Bobby was also dismissed from No. 478 based on a failure of service. (Doc. 32, PageID 298.) Bobby was named in No. 475 but was excluded from the cast of defendants in No. 478.

[18]Although the factual underpinnings remain the same for all CoreCivic Defendants, Plaintiff seeks amendment to add details to his existing claims and a new Eighth Amendment claim against the CoreCivic Defendants based on events that occurred when Plaintiff was incarcerated at NEOCC. (See Doc. 33-2, PageID 390-391.) Res judicata still applies since all events had occurred prior to the time that Plaintiff filed his complaint in No. 478.

*7. (W.D. Mich. Feb. 1, 2019) (rejecting inmate's attempt to add new defendants and claims under PLRA based on res judicata); *Annabel*, 2017 WL 11639427, at *3 (rejecting inmate's attempt to add new defendants because the claims "should have been raised" in the prior litigation.)

Likewise, Plaintiff's "new and improved" first two claims against State Defendants Oppy and Davis are procedurally barred, with limited exceptions for conduct alleged to have taken place after the date that No. 478 was filed in retaliation for that litigation. Despite their omission from No. 478, [19] Oppy and Davis were clearly in privity with State Defendants Chambers-Smith and Lambert, who won dismissal of Plaintiff's First Amendment retaliation and procedural due process claims in No. 478. Therefore, for events up to and including July 28, 2023, all of Plaintiff's claims against all State and CoreCivic Defendants[20] named in the above-captioned No. 397 are procedurally barred by this Court's prior dismissal of No. 478.

### B. The Court's Substantive Reasoning in No. 478 is Persuasive

Res judicata is a procedural bar. To the extent that a reviewing court may disagree with the foregoing analysis, the undersigned alternatively adopts the Court's substantive reasoning in No. 478 as highly persuasive.

Start with Plaintiff's claim that various defendants retaliated against him when they transferred him from NEOCC to OSP, and then transferred him again to SOCF. A First Amendment retaliation claim has three elements: "(1) the plaintiff engaged in protected

---

[19]Defendants Oppy and Davis were not original defendants in No. 475, but were added on January 15, 2024 through an amended pleading. In contrast to the amended pleadings filed in No. 475 and in this case, Plaintiff never amended his complaint in No. 478.

[20]Plaintiff has never served the State Defendant identified as the "Unknown Block Officer," and the time for doing so has long expired. Because it is clear that Plaintiff has failed to state a claim against the Block Officer and that he is in privity with the other State Defendants, the undersigned includes him among the defendants to be dismissed with prejudice.

conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (citations omitted). In No. 478, the Court held that Plaintiff's allegations failed to state a First Amendment retaliation claim in part because "a prison official's decision to transfer a prisoner from the general population of one prison to the general population of another is not considered adverse." (No. 478, Doc. 31, PageID 157, quoting *Lafountain v. Harry*, 716 F.3d 944, 948 (6th Cir. 2013)). The Court pointed out that "Plaintiff does not allege or argue that there were any foreseeable, negative consequences resulting from his transfer" in No. 478 – a fact that remains true in the instant case. (*See id*.) The Court reasoned that absent such consequences, Plaintiff had failed to state a retaliation claim against any Defendant. (*Id.*)

In Plaintiff's newest iteration in No. 397, he alleges that the State Defendants have continued to retaliate by refusing to transfer him to his institution of choice. But "[a] prisoner has no inherent constitutional right to be housed in a particular institution or to enjoy a particular security classification." *Beard v. Livesay*, 798 F.2d 874, 876 (6th Cir. 1986) (citations omitted). In addition, "transfer from one prison to another prison 'cannot rise to the level of an 'adverse action' because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights.'" *Smith v. Yarrow*, 78 Fed. Appx. 529, 543 (6th Cir. 2003) (quoting *Mandela v. Campbell*, 181 F.3d 102 (6th Cir. 1999).) The same rule of law would apply to decisions not to transfer inmates to another institution. *Woods v. Crockett-Harris*, No. 2:12-cv-231, 2012 WL 1440341, *4 (S.D. Ohio

18

Apr. 26, 2012). "[A] finding of adverse action would go against the general rule that involuntary transfer [or non-transfer] is an ordinary incident of prison life and insufficient to deter a person of ordinary firmness." *Id.* In other words, even though the refusal-to-transfer occurred after July 28, 2023, this portion of the new retaliation claim fails to state a claim on the merits.

Turning to Plaintiff's claim that he was transferred to OSP in violation of his procedural due process rights under the Fourteenth Amendment, Judge McFarland previously noted that an inmate's transfer to OSP can represent the type of "atypical and significant" hardship that impacts an inmate's liberty interest "given the combination of extreme isolation of inmates, prohibition of almost all human contact, indefinite duration of assignment, and disqualification for parole consideration of otherwise eligible inmates." (No. 478, Doc. 31, PageID 159 (quoting *Jarrett v. Greene*, No. I:22-cv-456, 2022 U.S. Dist. LEXIS 193839, at *31-32 (S.D. Ohio Oct. 24, 2022)); *see also Wilkinson v. Austin*, 545 U.S. 209, 223-24 (2005). Next, Judge McFarland theorized that the transfer of Plaintiff to OSP without following Ohio's policy for such transfers or any other procedural protections "*may* constitute a procedural due process violation against Plaintiff." (Doc. 31, PageID 161-162) (emphasis added). Even if Plaintiff could state most elements of a procedural violation, however, Judge McFarland determined that Plaintiff still failed to state a due process claim in No. 478.

While Plaintiff named multiple wardens and supervisors as having approved of his transfer, *respondeat superior* liability for supervisors does not exist under § 1983. *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021). A supervisor is not liable under § 1983 unless the supervisor "either encouraged the specific incident of misconduct or in

19

some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Phillips v. Roane Cnty., Tenn*., 534 F.3d 531, 543 (6th Cir. 2008) (quoting *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999) (additional citation omitted)). In No. 478, the Court reasoned that "Plaintiff has not shown that any of the Individual Defendants were personally involved in the decision to transfer him." (No. 478, Doc. 31, PageID 162.)

> Plaintiff admits that Fender was not personally involved, and requests that he be dismissed from this action. (Plaintiff's Response to Fender and Wyman Motion, Doc. 16, Pg. ID 95.) But, Plaintiff argues that the Court should assume that Wyman, Chambers-Smith, and Lambert were somehow involved with Plaintiff's transfer based on their leadership roles. (*Id.* at Pg. ID 96; Plaintiff's Response to Chambers-Smith and Lambert's Motion, Doc. 15, Pg. ID 89-90.)

> "The mere existence of supervisory relationship to the actual wrongdoer is not enough to establish personal liability." *McKinney v. Kasich*, No. 2:15-CV-2043, 2016 U.S. Dist. LEXIS 39519, at *16 (S.D. Ohio Mar. 25, 2016) (citation omitted). A "§ 1983 claim must fail against a supervisory official unless the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Cardinal v. Metrish*, 564 F.3d 794, 802-03 (6th Cir. 2009). "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Grinter v. Knight*, 532 F.3d 567,575 (6th Cir. 2008) (quotation omitted).

> Plaintiff has not alleged that Individual Defendants were personally involved in the allegedly unconstitutional conduct. Plaintiff's only allegations concerning Individual Defendants center around identifying their specific roles within ODRC or NOECC. (Compl., Doc. 1, ¶¶ 9-11, 14.) Plaintiff provides no allegations relating the Individual Defendants to Plaintiff's transfer. (*See id.*) Plaintiff does not allege that Individual Defendants "encouraged" or "directly participated" in the alleged misconduct. *Cardinal*, 564 F.3d at 802-03. Nor does Plaintiff allege that the Individual Defendants "implicitly authorized, approved or knowingly acquiesced" to the alleged misconduct. *Grinter*, 532 F.3d at 575. So, even if Plaintiff's transfer to OSP constitutes a due process violation, Plaintiff's § 1983 claims against Individual Defendants cannot proceed because Plaintiff failed to identify Individual Defendants' personal involvement in the alleged misconduct.

(*Id.*, PageID 162-164).

In the above-captioned case, all Defendants again urge dismissal based on Plaintiff's failure to specifically identify the personal involvement of each Defendant beyond identifying their supervisory roles. (Doc. 25, PageID 224-225.) In response, Plaintiff cites to ¶¶ 36, 61, 64 and 88 of his Second Amended Complaint. (*See* Doc. 32, PageID 300). But having compared those allegations to those previously made in No. 478, the undersigned agrees that the Court's prior analysis remains on point. Plaintiff merely speculates that the supervisory personnel must have been personally involved not merely in the transfer but in the violation of his constitutional rights. He theorizes they must have personally decided to transfer him in retaliation for his threat to file a grievance and/or for filing kites about how NEOCC was being run. (*Compare*, *e.g.*, No. 397, Doc. 8, ¶ 88, alleging that "Defendants Chambers-Smith and Bobby would have decided and authorized the transfer to OSP" with prior allegations in No. 478, Doc. 1, ¶¶ 48-49).

Finally, Judge McFarland's prior analysis of Defendants' Eleventh Amendment immunity in No. 478 applies with equal force to Plaintiff's § 1983 claims in this case for monetary damages against all Defendants in their official capacities, as well as to his claims against CoreCivic.

> The Eleventh Amendment operates as a bar to federal-court jurisdiction when a private citizen sues a state or its instrumentalities without the state's express consent. *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1983); *Lawson v. Shelby Cnty.*, 211 F.3d 331, 334 (6th Cir. 2000). This prohibition applies to "all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments." *Thiokol Corp. v. Mich. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993) (citation omitted). Though, Eleventh Amendment immunity "does not apply if the lawsuit is filed against a state official for purely injunctive relief enjoining the official from violating federal law." *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (citing *Ex Parte Young*, 209 U.S. 123, 155-56 (1908)). Ohio has not waived

its Eleventh Amendment immunity in federal courts. *Mixon v. State of Ohio*, 193 F.3d 389,397 (6th Cir. 1999). So, Plaintiff's § 1983 claims against Ohio - in which he only seeks monetary damages - fails under the Eleventh Amendment.

Plaintiff's § 1983 claims against Core Civic also fail. When a private entity like Core Civic "performs the traditional state function of operating a prison," it "acts under the color of state law for purposes of § 1983." *Thomas v. Coble*, 55 F. App'x 748, 748 (6th Cir. 2003); (Compl., Doc. 1, ¶ 15.) To state a § 1983 claim against Core Civic, Plaintiff must show that the alleged deprivation of his rights was due to a policy or custom of Core Civic. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Thomas*, 55 F. App'x at 749. Plaintiff does not allege that his injuries were the result of an unconstitutional policy or custom of Core Civic. (*See* Compl., Doc. 1.) Consequently, his § 1983 claims against Core Civic would not survive.

(No. 478, Doc. 31, PageID 164-165).

In both No. 478 and No. 397, Plaintiff includes virtually identical allegations that CoreCivic runs multiple prisons in Kansas, Tennessee and Ohio that are "dangerously understaffed." (*Compare* No. 478, Doc. 1, ¶ 17 *with* No. 397, No. 8, ¶ 21.) In both cases, Plaintiff alleges that CoreCivic chronically understaffs NEOCC "to maximize profits and reduce costs," and recruited gang members to "[keep] the peace" to help maximize profits. (*See* No. 478, Doc. 1, ¶ 4.) But in a transparent attempt to avoid the impact of Judge McFarland's prior analysis, Plaintiff adds new "policy or custom" references to his Second Amended Complaint in No. 397. Plaintiff newly alleges that CoreCivic "*has an unwritten nationwide custom or policy*" of understaffing and recruiting gang members to maximize profits,. (Doc. 8, ¶21, PageID 142 (emphasis added)). He further alleges that "Defendant Chambers-Smith is aware of this unwritten nationwide custom or policy," and that the "custom or policy …is a direct and proximate cause of the injuries to the Plaintiff." (*Id.*). In other words, Plaintiff adds conclusory "custom and policy" allegations in order to support the previously dismissed *Monell* claim. While most clearly barred by res judicata,

22

Plaintiff's new and improved allegations arguably still fail to state a *Monell* claim because they are so conclusory. *See Braunskill v. Smith*, No. 1:24-cv-140-MWM-SKB, 2024 WL 4465269, at *4 (S.D. Ohio Jun. 11, 2024).

### C. Portions of Plaintiff's New Retaliation Claim May Proceed

In a newly alleged third claim in No. 397, Plaintiff alleges ongoing First Amendment retaliation by multiple Defendants at SOCF, including a new due process violation and conditions of confinement so inhumane that they violate the Eighth Amendment. (Doc. 8, ¶¶ 92-97.) Plaintiff argues that his third claim describes "acts of retaliation and due process… violations that occurred …. after the initial complaint was filed" in No. 478. (Doc. 32, PageID 298). Because the events in question occurred after July 28, 2023, Plaintiff argues that his third claim could not have been previously litigated and is not barred by res judicata. *See Tolliver v. Ohio DRC*, No. 2:22-cv-4567-EAS-KAJ, 2024 WL 3992381 (S.D. Ohio Aug. 27, 2024), report and recommendation adopted at 2024 WL 4452294 (S.D. Ohio Oct. 9, 2024).

The parties' memoranda on Plaintiff's motion for preliminary injunction did not brief this timing aspect, and Judge McFarland's order denying preliminary injunctive relief does not appear to have fully considered the issue.[21] To the extent that Judge McFarland's prior order left the issue unresolved, the undersigned would agree that a claim alleging new conduct that occurred after July 28, 2023 would not be barred by res judicata. Nonetheless, most allegations still fail to state a claim on the merits.

---

[21]That said, Judge McFarland included a summary of some of Plaintiff's post-July 2023 allegations before concluding that *all* claims against Defendants Chambers-Smith and Lambert were procedurally barred, without discussion of the timing of events. (Doc. 37, PageID 467-468, 473.)

Plaintiff alleges that State Defendants Davis and Oppy are liable for the following actions taken at SOCF in retaliation for Plaintiff's 2023 lawsuit: (1) a lack of heat in his cell; (2) unsanitary showers; (3) an adverse security level; and (4) refusing to transfer Plaintiff to Toledo Correctional Institution ("ToCI"). With respect to the lack of heat, Plaintiff alleges:

> 17. Defendant Jeremy Oppy is the Unit Manager Chief …[who] is responsible for administering the facility's different housing units. … He has retaliated against the Plaintiff by refusing to transfer him to Toledo Correctional, refusing to lower his security level, and knowing of the lack of heat in the Plaintiff's block but being indifferent. He told the Plaintiff that if he dropped the lawsuit, conditions would improve for him. This included the heat issue and the harassment.
>        * * *
> 51. During the winter of 2023-2024, Plaintiff had no heat in his cell. This cell was in cell block K4. The Warden did not order that the heat be fixed for the entire winter of 23-24. The issue is that the windows in the unit were open, allowing the cold to come into the cell block. The plaintiff complained about this lack of heat, and the administration ignored him. Defendants Davis and Oppy have repeatedly stated to Plaintiff that he is going through these issues because of his lawsuit and that if he were to drop his lawsuit, this would stop.

(Doc. 8, ¶¶ 17, 51). Later in his complaint, Plaintiff repeats ¶ 51 but adds that "correspondence was sent" to Davis. (*Id*., ¶94.) He alleges that both Davis and Oppy knew of the "freezing conditions" but "allow[ed] the heat to stay off and the windows open." (*Id*.) He further alleges that he sent "[n]umerous kites" such that both Davis and Oppy were aware of the lack of heat but "failed to fix the heat until the Plaintiff's lawsuit dropped." (*Id.*, ¶ 96, *see also id*., ¶ 79 (adding the lack of heat "is an apparent retaliation tactic by the administration to get Plaintiff to drop his lawsuit.")). Plaintiff alleges that he "was and continues to be, in constant and continuous pain" from the lack of heat and extreme winter conditions. (*Id*., ¶ 97.)

With respect to the shower, Plaintiff alleges:

> 52. During February 2024, the administration did not clean the showers in the Plaintiff's unit. The porter responsible for the showers would not wash them and open the windows, allowing the block to remain cold. The heat was beginning to work again, but this porter would open the windows, letting the heat out of the block. These windows stayed open, letting whatever heat out of the block. The plaintiff was and continues to be, in constant and continuous pain since this torture occurred.

(Doc. 8, ¶ 52; *see also id.*, ¶ 80, 95, 97 (duplicate allegations).)

Last, Plaintiff alleges that he requested a transfer to ToCI but that "Davis and Oppy have prevented this transfer from occurring,"(Doc. 8, ¶ 53), and that "Defendant Oppy has clarified that this refusal is related to his lawsuit." (Doc. 8, ¶ 81.) He further alleges that Oppy and Davis held a security review hearing and "raised" Plaintiff's security level "to Level E" even though he was not present. (Doc. 8, ¶ 66.)[22]

### 1. Plaintiff's New Allegations Implicate Only Davis and Oppy

Plaintiff's new allegations connect the timing of the new "retaliation" to the date he filed his lawsuits in No. 475 and No. 478. His new allegations are limited to events at SOCF and implicate only State Defendants Davis and Oppy.[23] The CoreCivic Defendants do not operate or control SOCF. Therefore, Plaintiff fails to state a new claim for relief against either the CoreCivic Defendants or any other State Defendant, including Chambers-Smith.[24]

### 2. The Refusal to Transfer and Dirty Shower Fail to State a Claim

---

[22]In his tendered Third Amended Complaint, Plaintiff alleges that Davis and Oppy "stated directly to the plaintiff that he would be moved out of the cold cell block, his security level would be reduced and he would even receive the transfer to Toledo if the plaintiff dropped his lawsuit." (Doc. 33-2, ¶ 51, PageID 385.)

[23]Additional allegations in Plaintiff's complaint refer to actions by an unidentified SOCF block officer, or allege vague threats by other unnamed inmates and unidentified guards on unspecified dates. (*See*, *e.g.*, Doc. 8, ¶¶ 75-78). The undersigned finds no need to discuss those allegations in detail because Plaintiff fails to connect them to the claims against the Defendants who were served in this case. "'[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state ... a claim under § 1983.'" *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)). In addition, verbal harassment and minor threats do not constitute adverse action. *Smith v. Craven*, 61 Fed. Appx. 159, 162 (6th Cir. 2003).

[24]As discussed, Plaintiff concedes that State Defendant Lambert should be dismissed, and has never identified or served the only other State Defendant, described as the "Unknown Block Officer."

A retaliation claim must be based upon some type of adverse action sufficient to deter a person of ordinary fitness from exercising their First Amendment rights. For the reasons discussed above, Defendants' alleged refusal to transfer Plaintiff to ToCI is not sufficiently adverse to support Plaintiff's alleged "ongoing retaliation" claim. See *Smith v. Yarrow*, 78 Fed. Appx. at 543.

Plaintiff's allegations that the shower area was not clean, and that open windows caused the area to be cold, also fall short. A less-than-pristine and uncomfortably cold shower area is by definition a temporary condition that Plaintiff would have been subjected to only during the minutes he was showering. It is not the type of condition that would deter a person of ordinary firmness from exercising his First Amendment rights.

Given the minor nature of Plaintiff's complaints, it is clear that the allegations regarding the shower area also do not rise to the level of a separate constitutional deprivation. The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation," or "other conditions intolerable for prison confinement." *Rhodes v. Chapman,* 452 U.S. 337, 348 (1981). "Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987).

> Conditions-of-confinement cases are highly fact-specific. "In general, the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while 'substantial deprivations of shelter, food, drinking water, and sanitation' may meet the standard despite a shorter duration." *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (internal citation omitted). Claims alleging unsanitary conditions due to clogged toilets and leaky plumbing are relatively common....
>
> Colloquially speaking, the "yuck" factor influences the assessment of the severity of the deprivation to sanitation and level of risk to health and safety.

26

> Thus, cases involving excrement or feces, or raw sewage from toilet overflows, tend to evoke greater concern than cases ...involving leaky pipes that result in a lesser degree of non-potable or contaminated water. In assessing the risk of serious harm, courts take a common sense approach. A condition that might not offend the Eighth Amendment over a shorter period of time could violate the Eighth Amendment if the inmate was subjected to the condition over a long period.
>
> ...[In cases] involving leaks of unsanitary water from damaged pipes, courts have held that even fairly long exposure will not satisfy the objective component of the Eighth Amendment in the absence of any physical harm.

*Still v. Davis*, No. 1:16-cv-640-SJD-SKB, 2018 WL 1202827, at *5 (S.D. Ohio Mar. 8, 2018) (collecting and discussing cases involving exposure to raw sewage), report and recommendation adopted at 2018 WL 2943227 (S.D. Ohio June 12, 2018).

### 3. Extreme Cold is Arguably Sufficient to State a Claim

In contrast to his allegation that his shower area was not adequately cleaned by the porter assigned to that duty, Plaintiff's allegations that Oppy and Davis condoned and approved of his placement in a cell with open windows and a lack of heat, forcing him to endure months of freezing temperatures, are arguably sufficient to state claims under the Eighth and/or First Amendments under evolving case law. In *Smith v. Bush*, No. 23-1644, 2024 WL 242349 (6th Cir. Jan. 19, 2024), the Sixth Circuit considered a complaint by a Michigan inmate alleging he had been deprived of humane conditions of confinement when the Defendants failed to provide him with an adequate winter coat and he was repeatedly forced to stand outside for "long periods" (described as 15-30 minutes) for various activities. Like Plaintiff here, Smith failed to allege any actual injury. Upon initial PLRA screening, a magistrate judge had dismissed the claim as inadequate to state a claim. In a split decision, the Sixth Circuit reversed.

> "[E]xposure to Michigan winters without adequate clothing can obviously inflict pain," *Knop v. Johnson*, 977 F.2d 996, 1012–13 (6th Cir. 1992), and

27

> such conditions can rise to a violation of the Eighth Amendment, *see id.*; *see also Spencer v. Bouchard*, 449 F.3d 721, 728 (6th Cir. 2006), *abrogated on other grounds by Jones v. Bock*, 549 U.S. 199 (2007); *cf. Gordon v. Faber*, 973 F.2d 686 (8th Cir. 1992) (affirming an Eighth Amendment violation where prison official forced inmates outside in subfreezing temperatures and refused to provide hats and gloves). It is reasonable to infer that a coat lacking an outer shell is likely to permit water and wind to penetrate through to the wearer's skin, and that combining that wetness and wind with northern Michigan's "extreme cold" for up to 30 minutes at a time presents a risk of physical harm beyond mere inconvenience. That said, Smith's complaint is at least "plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

*Id.*, 2024 WL 242349, at *2.

The majority emphasized that the result might be different following development of a more complete record. Because it is unpublished, *Smith v. Bush* is not binding. And trial courts including this one often have dismissed claims of extreme temperature conditions when an inmate includes only vague allegations that specify no specific injury. See, e.g. *Bates v. Dyer*, No. 1:23-cv-16–JPH-KLL, 2023 WL 4073577 *8 (S.D. Ohio June 12, 2023) (dismissing claim of excessive heat in excess of 100 degrees where inmate had not alleged whether his exposure was "continuous or sporadic" or "any adverse health consequences from the heat."); *see also Provance v. Doe*, No. 4:24-CV-135-JHM, 2025 WL 1062475, at *4 (W.D. Ky. Apr. 8, 2025); *Wilson v. Timmerman-Cooper*, No. 2:14-cv-539-GCS-TPK, 2015 WL 457823, at *4 (S.D. Ohio Feb. 3, 2015). On the whole, however, Plaintiff's allegations of extremely cold conditions for not mere days but months, coupled with pain, appear to state an Eighth Amendment claim at the pleading stage. *See, generally, King v. Coffee County Mayor*, No. 1:24-cv-193-CLC, 2024 WL 3106749 (E.D. Tenn. Jun 24, 2024).

Defendants Davis and Oppy also complain that Plaintiff does not sufficiently allege their personal involvement. But at this stage of the proceedings, the Court must draw all

28

reasonable inferences in Plaintiff's favor. Defendants' personal role is reasonably inferred from allegations that they stated directly to Plaintiff that his cell conditions would improve if he were to drop his lawsuit. *See Venema v. West*, 133 F.4th 625 (6th Cir. 2025) (affirming denial of warden's motion to dismiss). Therefore, Plaintiff's allegations also sufficiently state a First Amendment retaliation claim.

### 4. Plaintiff's Security Review Claim

Plaintiff further alleges that Defendants Davis and Oppy engaged in a retaliatory due process violation on August 1, 2023 when they reviewed his security classification outside of his presence, and "raised" his security level to the equivalent of the "supermax" level of restriction. (Doc. 8, ¶ 66, 41.) As Defendants point out, Plaintiff inconsistently alleges that his security classification also was raised in August 2022, and that he was then "placed for five years in Level E" which subjected him to "restricted housing." (*Id.*, ¶ 39.) Logically, Plaintiff's allegations suggest that the security level that he had been assigned in August 2022 did not change in August 2023.

But Plaintiff explains that a recommended security level reduction at the 2023 hearing "was overruled by Defendant Oppy due to Plaintiff not dropping his lawsuit." (Doc. 32, PageID 301.) Elsewhere in the record, Plaintiff claims that Defendants Davis and Oppy "willfully and intentionally destroyed the audio and video evidence" of the security hearing both to conceal that the paperwork showing Plaintiff's presence was forged, and to conceal "that Defendant Oppy claimed [Plaintiff's] level would be reduced if he dropped the lawsuit." (Doc. 9, PageID 167, seeking "spoliation sanctions.") Again, because the undersigned must draw all reasonable inferences in Plaintiff's favor at the pleading stage,

the undersigned finds that Plaintiff has sufficiently alleged a retaliatory due process claim regarding his security classification against State Defendants Davis and Oppy.

### D. Defendants Davis and Oppy are not Entitled to Qualified Immunity

All State Defendants briefly argue that they are entitled to qualified immunity based on Plaintiff's failure to state any constitutional claims. State Defendant Chambers-Smith is entitled to qualified immunity on that basis. But because the undersigned has concluded that Plaintiff's Second Amended Complaint sufficiently alleges several constitutional violations by Defendants Davis and Oppy, those two Defendants are not entitled to qualified immunity at this time. That said, Defendants remain free to renew their motion for qualified immunity following further development of the record. *See Venema v. West*, 133 F.4th at 632. "Although a defendant's 'entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12.'" *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (cleaned up).

### V. Plaintiff's Motions for Declaratory Judgment and for Spoliation Sanctions Should be Denied

Above, the undersigned has explained why Plaintiff's motion for leave to file a Third Amended Complaint in this case should be denied. So too, should Plaintiff's separate motion for a declaratory judgment "stating that the plaintiff's July 29, 2022 transfer from NEOCC prison to O.S.P. Supermax prison" violated Plaintiff's procedural due process rights. (Doc. 34, PageID 446.)[25] Plaintiff is not entitled to judgment on a claim for which dismissal has been recommended.

---

[25]Although styled as a motion for declaratory judgment, the body of the motion also seeks preliminary injunctive relief. Plaintiff is not entitled to preliminary injunctive relief for the reasons that Judge McFarland stated in his March 21, 2025 Order. (Doc. 37.)

Plaintiff's motion for "spoliation" sanctions against Defendants Davis and Oppy also should be denied. The motion is based on Plaintiff's allegations that Defendants destroyed audio and video evidence relating to the August 2023 hearing review of Plaintiff's security classification. The motion is premature given that this case has not yet progressed to the discovery phase. In the event that this case proceeds to trial, the presiding district judge may make evidentiary rulings or fashion appropriate jury instructions if relevant evidence was intentionally destroyed.  Additionally, Plaintiff filed a Request for Leave to File a Reply and Attached Exhibits to Defendants' Cyntha Davis and Jeremy Oppys' Memorandum in Opposition to Plaintiffs Motion for Spoliation Sanctions (Doc. 31).  Since the motion for "spoliation" sanctions should be denied as premature, this request for leave should be denied as moot.

## VI.    Conclusion and Recommendation

Accordingly, **IT IS RECOMMENDED:**

1.  The CoreCivic Defendants' motion to dismiss (Doc. 20) should be **GRANTED**;

2.  The State Defendants' motion to dismiss (Doc. 25) should be **GRANTED in part and DENIED in part**;

    a.  Plaintiff's claims of retaliatory conduct by Defendants Davis and Oppy relating to the lack of heat in his cell and a security classification hearing held in August 2023 may proceed;

    b.  All other claims against all other Defendants should be dismissed;

3.  Plaintiff's motions for leave to file an amended complaint (Doc. 33), for declaratory judgment (Doc. 34) and for spoliation sanctions (Doc. 9) all should be **DENIED**; and

4. Plaintiff's Request for Leave to File a Reply and Attached Exhibits to Defendants' Cyntha Davis and Jeremy Oppys' Memorandum in Opposition to Plaintiffs Motion for Spoilation Sanctions (Doc. 31) should also be **DENIED as moot**.


 _s/Stephanie K. Bowman_
Stephanie K. Bowman
United States Chief Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

YUSEF BROWN-AUSTIN,                        Case No. 1:24-cv-397

      Plaintiff,                       McFarland, J.
                                      Bowman, M.J.

      v.

ANNETTE CHAMBERS-SMITH, et al.,

      Defendants.

**NOTICE**

Under Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).